IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:05cr353

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | |
| ) | ORDER |
| AARON LARICO WYLIE ) | |
| ) | |

    The defendant, Aaron Larico Wylie, was arrested after several witnesses identified him through one of two six-panel black-and-white photo arrays as the person responsible for a series of hotel robberies. He subsequently confessed during custodial interrogation, and currently is charged with Hobbes Act Robbery of various hotels, and carrying a firearm during the same.

    Presently before the Court is the defendant's motion to suppress. (Doc No. 24) The defendant contends that out-of-court identifications by witnesses were based upon photo arrays so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. He also contends that his post-arrest confession should to be suppressed on the grounds that it was taken in violation of <u>Miranda</u> and coerced. The Court conducted a suppression hearing on May 5, 2006, after which it took the matter under advisement. The Court also ordered the government to provide the original photo arrays and indicated that it would review the audio tape, which it now has done. Based on the record before it, the Court finds that the defendant has failed to offer any evidence that the photo arrays were constructed or presented in a unduly suggestive manner, or would in some other way offend due process. The Court also finds that the defendant's waiver of his <u>Miranda</u> rights was knowing and voluntary, and that the record offers no evidence of coercion or intimidation. The reasons for this ruling follow,

1

beginning with the Court's factual findings.

## FACTUAL FINDINGS

The AmeriSuites hotel was robbed on December 30, 2003, making it the latest in a series of hotel robberies in which the suspect would enter a hotel while talking on a cell-phone, brandish a gun at hotel staffers, and demand money.

Immediately following the robbery of the AmeriSuites Hotel, the investigating officers interviewed an employee of the Fairfield Inn, which had been robbed the previous day. The employee provided the license plate of a suspicious vehicle, and the officers determined that the vehicle was registered to Aaron Wylie's father.

Suspecting that Wylie may be involved, Detective Arvin Fant compiled a photo lineup by using the computerized arrest database to arrange Wylie's photograph among five other photos of persons fairly representative of Wylie's features and general physical characteristics., i.e., gender, race, age, facial hair, hairstyle, and complexion. Detective Fant then interviewed Carolyn Lewis, the staffer of AmeriSuites Hotel who was working on December 30. The detective explained the line up procedure to her and placed the line-up face down. Ms. Lewis then turned the line-up over, and, after a brief hesitation, identified Wylie from the photo array as the man who had robbed her on both December 30 and December 17, 2003. Ms. Lewis signed and dated the time of her identification on the line-up. See Government Exhibit 3A.[1] Subsequently, a staffer from the Hampton Inn, which also had been robbed, identified Wylie from the same line-up. See Government Exhibit 5A. A third witness, employed at the Drury Inn, identified Wylie through a similar photo line-up, which had been compiled by Detective Randy Carroll. See Government

---

[1] At the suppression hearing the government offered copies of the line-ups, identified as government's exhibits 3-5. Subsequent to the hearing, the government provided the original line-ups, which are now identified as corresponding exhibits 3A-5A.

Exhibit 4A.

CMPD officers arrested Wylie at about 9:00 p.m. on New Year's Day at a gas station and transported him to the CMPD Law Enforcement Center. The officers placed Wylie in a standard interview room, about eight feet by ten feet in size, and shackled one of his ankles to the floor for officer safety.

Detectives Randy Carroll and Kim Gragg,[2] both unarmed and dressed in plain clothes, met with the defendant at about 11:00 that evening. Detective Carroll recited <u>Miranda</u> warnings to Wylie, who then voluntarily signed a written waiver of rights form. Shortly after the interview began, the detectives asked Wylie about the December 30th robbery of the AmeriSuites Hotel. He claimed that he was at his aunt's house at the time of the robbery. The detectives left to verify his alibi, which was refuted, and returned about two hours later. Wylie thereafter confessed to the AmeriSuites robbery. Over the next two hours, Detectives Carroll and Gragg questioned Wylie about a number of the robberies (approximately twenty-nine) in which he was a suspect. Around 4:00 am that morning, the detectives reminded Wylie of his <u>Miranda</u> rights and then reviewed the litany of robberies with Wylie, recording the interview on tape. During the interview, the detectives repeatedly instructed the defendant not to guess and admit only to the crimes he recalled having committed.

## PHOTO IDENTIFICATION

In order to successfully challenge the out-of-court identification procedure, the defendant first must prove that the identification procedure was "impermissibly suggestive," i.e., that "a positive identification is likely to result from factors other than the witness's own recollection of the crime." <u>Satcher v. Pruett</u>, 126 F.3d 561, 566 (4th Cir. 1997). If the defendant cannot meet

---

[2]At the suppression hearing, Detective Gragg was referred to by her (now) married name "Kyle."

this burden, then the inquiry ends and any concerns relating to the reliability will be left to the jury. Harker v. Maryland, 800 F.2d 437, 444 (4th Cir. 1986)  However, if the defendant makes his showing, then the Court must determine whether under the totality of the circumstances the in-court identification is independently reliable rather than the product of the earlier suggestive procedure.

Wylie contends in his motion to suppress that "because the photographic identification procedure was not outlined in the discovery the procedure was obviously suggestive and prejudicial."  However, at the suppression hearing, Wylie failed to describe how either the procedure used for compiling the photo arrays, the particular arrays used to identify the defendant, or the manner in which the arrays were presented to the witnesses were impermissibly suggestive.  The Court's own review of the photo arrays in question reveals nothing that would suggest to an identifying witness that Wylie was more likely to be the culprit than the others depicted in the arrays.  His general features, including his age, hairstyle, and complexion, appear reasonably comparable to the others depicted in the photo arrays.  And his photograph bears no greater resemblance to the general description provided by the witnesses than do the other men depicted in the photo arrays.  Thus, as the defendant has failed to show that the photo arrays were unduly suggestive, or would in some other way offend due process, and the Court need not proceed to the second prong of the analysis.  The defendant's motion to suppress the out-of-court identification will be denied.

## CONFESSION

Because the detectives obtained the defendant's confession during a custodial interrogation, it is presumptively compelled.  United States v. Cardwell, 433 F.3d 378 (4th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 457-58, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

The government can overcome this presumption by showing 1) that the detectives adequately informed the defendant of his Miranda rights, and obtained a waiver of those rights; and 2) that his will was not overborne by police coercion or deception. United States v. Cristobal, 293 F.3d 134 (4th Cir. 2002).

1. Miranda Waiver

Although Wylie contends that he was never read his Miranda rights, the Court finds that the provisions of Miranda were explained to him, and he then clearly, knowingly and voluntarily relinquished those rights. Prior to the interview, Detective Carroll reviewed with Wylie an "Adult Waiver of Rights" form, which Wylie initialed in several places and signed at the bottom. In particular, Wylie initialed statements acknowledging that he had the rights to consult with an attorney, to have an attorney present during questioning, and to stop answering questions until he spoke with an attorney. See North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979) (finding that although it is not conclusive, the defendant's signing of the waiver form is strong proof of the validity of that waiver). There is no evidence to suggest that Wylie was not able to understand the waiver form. He appears to be a mature adult of average intelligence. Whatever stress or discomfort he may have felt was no greater than that which is experienced by suspects generally when considering their post-arrest alternatives. After having observed the Wylie's testimony, the Court attributes little weight to the fact that the defendant now asserts that was unaware of his rights. See United States v. Wertz, 625 F.2d 1128, 1136 (4th Cir. 1980) (subsequent testimony by an accused about his prior subjective mental impressions and reactions must be carefully scrutinized as such testimony is "always influenced by [his] self-interest.").

Wylie's principal argument is that Detectives Gragg and Carroll rebuffed his demand for

an attorney and his requests that interrogation stop and he be taken to jail. Wylie specifically contends that he said "I want a lawyer," and Detective Carroll responded "I'll get you 40 years, how about that?" However, to the extent that the defendant argues that his requests either for an attorney or to end questioning were not heeded, the Court finds his testimony simply not credible. Such assertion is rebutted by his signed waiver and by the detectives' testimony, which the Court finds credible, that had the defendant requested an attorney or expressed a desire to remain silent, the interview immediately would have ceased.

2.  Voluntariness of Confession

Wylie argues that the circumstances of the his physical surroundings and length of questioning were inherently coercive. However, "[t]here is nothing inherently wrong with efforts to create a favorable climate for confession." Hawkins v. Lynaugh, 844 F.2d 1132, 1140 (5th Cir. 1988). "Obviously, interrogation of a suspect will involve *some* pressure because its purpose is to elicit a confession. . . . [T]he fact that the tactics produced the intended result . . . does not make [a] confession involuntary." United States v. Astello, 241 F.3d 965, 967-968 (8th Cir. 2001) (emphasis added). Rather, the question is whether under the totality of the circumstances the pressures exerted by the authorities in securing a confession reach the coercive intensity such that "the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987). Based on the record before it, the Court finds that the typical indicia of coercion are absent, and the defendant was not intimidated and no coercion was used secure his confession. See United States v. Elie, 111 F.3d 1135, 1143 (4th Cir. 1997) (discussing factors that would render a confession involuntary).

First, such basic police procedures as restraining a suspect (suspected of committing twenty-nine armed robberies) for officer safety purposes do not suggest coercion in and of

themselves. United States v. Seni, 662 F.2d 277 282 (4th Cir. 1981) (citing United States v. Ogden, 572 F.2d 501, 502 (5th Cir. 1978)). Nor is there anything inherently coercive about confining the defendant to a standard-sized (and otherwise unremarkable) interview room for approximately seven hours. See, e.g., Vance v. Bordenkircher, 692 F.2d 978, (4th Cir. 1982) (intermittent interrogation over period of next nine hours not coerced); Clark v. Murphy, 331 F.3d 1062 (9th Cir. 2003) (nothing coercive so as to render his confession involuntary, where he was detained and intermittently questioned in standard interview room for approximately eight hours). While it is true the defendant was subject to four hours of questioning, the detectives provided him with a meal, and, although he never asked, Wylie was not denied a chance to make phone calls or access a restroom. Thus, under the circumstances, nothing in the setting is sufficiently coercive to render a confession involuntary.

Second, while Detective Carroll's raised voice may have unsettled the defendant, Carroll never threatened or used physical violence. Merely yelling once or twice, or "getting in the face" of the defendant, does not reach the degree of physical coercion or trickery by authorities sufficient to render a statement involuntary. See Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) ("tactics such as raised voices . . . do not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne."). Similarly, neither expressing disbelief in the statements of the defendant in this case, nor continuing to question on specific matters constitute coercion. Such tactics often are necessary to achieve the truth. Furthermore, the detectives repeatedly instructed the defendant to not guess, and to admit only to the crimes he recalled having committed. And while the defendant argues that he felt intimidated, the Court's review of the audio tape suggests otherwise. See Wertz, supra; United States v. Robertson, 582 F.2d 1356, 1366 (5th Cir. 1978) ("[the] accused's subsequent account of his prior

7

subjective mental impressions cannot be considered the sole determinative factor. Otherwise, every confession would be vulnerable to such subsequent challenge."). The defendant twice responded "yes" when asked whether he had been read and waived his rights. And, while the defendant admitted details of certain robberies and his accomplices, he flatly denied involvement in others, i.e., the robbery of the Doubletree Hotel located near the South Park Mall, all of which more credibly suggest that he was not intimidated and Detective Carroll's behavior was not coercive.

Likewise, Detective Carroll's straightforward statements of the possible penalties that the defendant faced are not sufficient to render a subsequent incriminating statement involuntary. The detective's statements were merely an accurate representation of Wylie's predicament. See also United States v. Braxton, 112 F.3d at 782; United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir. 1978) ("telling [the] defendant in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government."). Likewise, a suggestion that Wylie's cooperation will be made known to the district attorney is not an improper inducement so as to render a subsequent incriminating statement involuntary.

Finally, although Wylie contends that he had a weakened capacity to resist the pressure to confess because he had not slept in several days, there is no evidence that the detectives deprived Wylie of sleep as a means of physical punishment. The fact that Wylie happened to be tired does not support a conclusion that his statements were involuntary. See Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' "). Furthermore, there is no indication that Wylie was suffering from any significant physical or mental impairment as a result of any

late-night activities or that he did not understand the significance of his actions. See Clagett v. Angelone, 209 F.3d 370, 382 (4th Cir. 2000). Wylie did not complain of being tired, nor is there any evidence in the record that would indicate that the detectives knew or suspected that he was excessively tired. Rather, Wylie was coherent and responsive throughout the interview. In particular, Wylie was able to distinguish the various robberies about which he was being questioned; remembered in detail some robberies while saying he did not remember others; and he provided a detailed description of both of his part-time accomplice "Jerry," and where he tossed the gun he used.

Thus, the Court finds nothing in the setting of the interrogation or the conduct of the detectives that would offend due process.

## CONCLUSION

For the aforementioned reasons, the Court finds that 1) the defendant has not met his burden of showing that the identification procedure was "impermissibly suggestive," and 2) the government clearly has established by a preponderance of the evidence that the defendant's waiver and confession were made knowingly and voluntarily.

**THEREFORE, IT IS HEREBY ORDERED** that the defendant's motion to suppress is **DENIED**.

Signed: May 19, 2006

_____
Robert J. Conrad, Jr.
United States District Judge